# FILOSA GRAFF LLP

Ariel Y. Graff
(212) 203-3473
agraff@filosagraff.com

## MEMO ENDORSED

June 12, 2026

**VIA ECF**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      **Re:**    ***Power, et ano. v. Mercy University, et al.*, Case No. 7:26-cv-02628 (KMK) (VR)**

Dear Judge Karas:

We represent Plaintiffs John Power and Manuel Ron in this action asserting claims for discrimination and retaliation based on race and age under Section 1981, the New York State and City Human Rights laws, and NY Labor Law. We respectfully submit this letter in response to Defendants' pre-motion conference application on an anticipated motion to dismiss pursuant to Rule 12(b)(6). As set forth below, Defendants' anticipated motion relies on mischaracterizations of the Complaint and applicable law. It would serve only to needlessly delay this litigation and should not be brought.

## I.    The Allegations of the Complaint

Plaintiff John Power served Defendant Mercy University for thirteen years, assuming critical leadership positions including Chair of Graduate Business and Program Director for the MBA program (Compl. ¶¶ 57-58). Plaintiff Manuel Ron served the University for over eleven years as an Assistant Dean, leading the Master of Science in Organizational Leadership and the Master of Science in Human Resources (*id.* ¶¶ 81-83).

The discriminatory campaign against Plaintiffs began after Defendant Victor Petenkemani was appointed as the Dean of the School of Business in 2024 (*id.* ¶ 32). At that time, Dean Petenkemani specifically told Dr. Power that the School of Business needed "less professors that look like you" and "more that look like our students" (*id.* ¶ 63). Dean Petenkemani made similar comments to several other faculty members (*id.* ¶ 64). Based upon those expressed demographic preferences, Dean Petenkemani manipulated the hiring process by submitting only the resumes of African American candidates for available full-time and part-time/adjunct openings (*id.* ¶ 35).

Between July 2024 and May 2025, the School of Business systematically eliminated or caused the termination of seven white professionals over the age of 50 (*id*. ¶ 37-38). This targeted group included Plaintiffs Power and Ron, as well as Raymond Manganelli and Barrie Shackman (*id*. ¶ 38). Orlando Borrero and Kelly Blacker[1] were also terminated or moved to be non-reappointed, and Valerie Pettite resigned during this same period (*id*.).

On February 21, 2025, Defendant Victor Petenkemani formally recommended that the University not renew Dr. Power's teaching contract (*id*. ¶ 65). On March 13, 2025, the University sent a written notice of nonrenewal to Mr. Ron (*id*. ¶ 85). In each instance, Defendant Petenkemani claimed that the decision not to renew the teaching contracts were based on "declining enrollment," but this justification was a mere pretext, as the decisions were based upon Petenkemani's desire to eliminate the older white faculty members (*id*. ¶¶ 42, 66, 86). Following the elimination of Plaintiffs Ron and Power, the University hired a new Associate Dean and new professors who were not white (*id*. ¶ 46). Additionally, the University posted available faculty positions on public job boards such as LinkedIn (*id*. ¶ 47). Dean Petenkemani also admitted to Dr. Power that a non-white faculty member retained in his stead was "not competent" to perform the same work as Dr. Power (*id*. ¶ 70).

Provost (Defendant) Kristin Greenwood rubber-stamped Dean Petenkemani's recommendations as to both Plaintiffs without conducting a requisite independent review (*id*. ¶¶ 40, 90). Although Mr. Ron submitted a 228-page Letter of Response and Dr. Power submitted a detailed written rebuttal, she completely ignored them (*id*. ¶¶ 40, 88, 90). On August 4, 2025, President Susan Parish wrote to both Plaintiffs Ron and Power advising them that they had been denied renewal of their appointments (*id*. ¶¶ 71, 91).

Both Plaintiffs filed complaints with the University's Title IX and Equity Compliance office alleging that Dean Petenkemani and the University discriminated against them based upon their age and race (*id*. ¶ 48). Initially, an external investigator named Odelia Levy was assigned to investigate the complaints (*id*. ¶ 49). However, Defendant Stephanie Catros suddenly removed Levy from investigating the matter, took charge herself, and intentionally steered her own investigation so that she could reach a predetermined conclusion that there had been no violation (*id*. ¶¶ 50-51).

In retaliation, Dean Petenkemani stripped Dr. Power of his leadership roles, removing him as Chair of Graduate Business as of July 1, 2025, and as MBA Program Director as of August 30, 2025 (*id*. ¶ 73). Dean Petenkemani escalated his harassment by ordering Dr. Power to spend eleven hours per day in the Manhattan office while continuing to teach evening courses until 10:00 p.m. (*id*. ¶ 74).

---

[1] Although its factual findings have no direct bearing on Defendants' proposed dismissal motion here, the New York State Supreme Court recently annulled one of these exact "for cause" terminations by the same decision makers, ordering full reinstatement of Professor Kelly Blacker with backpay after finding that her dismissal was unfounded and a "foregone conclusion at the outset of this process." *See Blacker v. Mercy Univ.*, 2026 NYLJ LEXIS 703, at *25 (Sup. Ct. Westchester Cty. Apr. 13, 2026).

Dr. Power mitigated his damages by obtaining adjunct professorships at Mount St. Vincent University and Queensborough Community College (*id*. ¶ 75). Mercy's Vice President of Human Resources subsequently issued an ultimatum on September 30, 2025, demanding that Dr. Power submit his resignation by the next day (*id*. ¶ 76). The University explicitly threatened to destroy Dr. Power's future professional prospects by contacting his newly secured employer (*id*. ¶ 77). Under extreme duress, Dr. Power submitted his resignation to Mercy University on October 1, 2025 (*id*. ¶ 78). Mercy University subsequently withheld earned compensation owed to Dr. Power for five classes and multiple tutorials he taught during the beginning of the Fall 2025 quarter (*id*. ¶ 79).

## II.     Direct Evidence of Racial Animus and Individual Supervisory Liability Defeat Defendants' "Stray Remark" and Same-Demographic Defenses

Defendants argue Plaintiffs fail to state a race or age discrimination claim because Dean Victor Petenkemani's verbalizations were isolated "stray remarks." They also assert that no inference of discriminatory animus can be drawn because Provost Kristin Greenwood and President Susan Parish share Plaintiffs' racial demographic. Both of these arguments are contrary to settled law.

Defendants' "stray remark" defense misapplies Second Circuit precedent. Under *Henry v. Wyeth Pharmaceuticals, Inc.*, courts evaluating discriminatory remarks must consider the speaker's role and the context of the statements. *See* 616 F.3d 134, 150 (2d Cir. 2010). When the person making the discriminatory remarks is the actual decision-maker who effectuates the adverse employment action, those statements are probative of discriminatory intent. *See Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007). Furthermore, remarks are never "stray" when coupled with "other indicia of discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).

Here, the Complaint alleges direct evidence of discriminatory intent. Dean Petenkemani orchestrated discriminatory conduct (Compl. ¶ 20). He explicitly informed Dr. Power that the School of Business required "less professors that look like you" and "more that look like our students" (*id*. ¶ 63). He made similar statements to other faculty within the School of Business and openly stated that the faculty needed to look less like the existing older white professors (*id*. ¶ 34).

These explicitly stated demographic mandates were then systematically executed (*id*. ¶ 36). During the eleven months following Defendant Petenkemani's appointment as Dean, from July 2024 to May 2025, the School of Business eliminated or forced out seven white professionals over the age of 50, including Plaintiffs (*id*. ¶ 37). During this same period, Dean Petenkemani manipulated the hiring pipeline by advancing the resumes of exclusively African American candidates for open roles and adjunct positions (*id*. ¶ 35).[2] He also admitted to Dr. Power that a

---

[2]     Defendants' reliance on *Ross*, *Cruz*, *Lent*, and *Wei* to discount Dean Petenkemani's statements as "stray remarks" is misplaced. In *Ross v. New York*, defendants argued the plaintiff was disciplined for distributing sexually explicit materials and "tap[ing] students using a 'spy video camera,'" but the court allowed the discrimination claim to proceed based on the alleged remark. *See* 2016 U.S. Dist. LEXIS 18517, at *14-15 (S.D.N.Y. Feb. 16, 2016). In *Cruz v. Bernstein Litowitz*, the supervisor stated he was "getting gray hair" about himself, not the plaintiff. *See* 2023 U.S. Dist. LEXIS 54426, at *32 (S.D.N.Y. Mar. 29, 2023). In

less qualified professor of his preferred demographic was being retained in Dr. Power's stead (*id.* ¶ 70).

Defendants' reliance on the demographic background of Provost Greenwood and President Parish is legally irrelevant.[3] The Supreme Court and Second Circuit explicitly reject the premise that shared demographics immunize an employer. *See Castaneda v. Partida*, 430 U.S. 482, 499 (1977); *Danzer*, 151 F.3d at 55 ("The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable."). As the Second Circuit held in *Feingold v. New York*, the Supreme Court has "rejected any conclusive presumption" that an employer "will not discriminate against members of their own race or gender," and "[i]t is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith." 366 F.3d 138, 155 (2d Cir. 2004).[4]

Additionally, citing *Cooper* and *Jones*, Defendants argue that a plaintiff's mere disappointment with an investigation does not provide sufficient grounds to infer discrimination. In making this argument, however, Defendants misrepresent Plaintiffs' allegations concerning the sham Title IX investigation at issue. Plaintiffs did not simply complain that the university's investigation was inadequate. Rather, the Complaint alleges that the University took over control of the investigation with the affirmative goal of validating Dean Petenkemani's clearly expressed discriminatory intention (Compl. ¶¶ 14, 51, 178, 183). After the investigation was initially assigned to outside specialist, Odelia Levy (*id.* ¶ 49), Defendant Catros abruptly removed Levy from the inquiry, assumed control, ignored detailed documentary evidence, and purposefully directed the inquiry toward a predetermined "no violation" finding (*id.* ¶¶ 14, 50-51). The active

---

*Lent v. City of New York*, the isolated remark was simply that the plaintiff was "old enough to retire," without more. *See* 209 A.D.3d 494, 495 (1st Dep't 2022). In *Wei v. Anthem Inc.*, the remarks were isolated questions about retirement dates. *See* 2018 U.S. Dist. LEXIS 224539, at *41-42 (E.D.N.Y. Sept. 4, 2018). None of Defendants' authorities involve an explicit directive by a department head to alter the racial and age demographics of a faculty, followed immediately by an 11-month purge of the identified class.

[3]     To the extent Defendants may also suggest that Dean Petenkemani's stated discriminatory preferences did not reflect the views of Provost Greenwood, Defendants ignore the "Cat's Paw" doctrine, under which an employer is liable when a biased supervisor provides inputs that proximately cause an ultimate decision-maker to execute an adverse action. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267 (2d Cir. 2016). Here, the Complaint explicitly alleges that Provost Greenwood rubber-stamped Dean Petenkemani's pretextual recommendations as to Plaintiffs without conducting the requisite independent review and deliberately ignored both the 228-page rebuttal submitted by Mr. Ron and written rebuttal submitted by Dr. Power (Compl. ¶¶ 40, 88, 90).

[4]     Defendants also cite *Palak*, *Williams*, and *Drummond* to argue that discriminatory animus cannot be inferred when decision-makers share the plaintiffs' demographics. These cases do not support dismissal here. Both *Palak* and *Drummond* explicitly acknowledge that the "same demographic" inference is not dispositive, as members of a protected class are fully capable of discriminating against their peers. *See Palak v. St. Francis Hosp.*, 2015 U.S. Dist. LEXIS 76511, at *20-21 (E.D.N.Y. June 12, 2015); *Drummond v. IPC Int'l., Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005). In *Williams v. Brooklyn Union Gas Co.*, the plaintiff offered no evidence of discrimination beyond his age, whereas Plaintiffs here allege direct discriminatory statements and a systematic race and age-based purge. *See* 819 F. Supp. 214, 225 (E.D.N.Y. 1993).

replacement of a neutral investigator with one who sought to produce a predetermined result is highly probative of the execution of a discriminatory objective.[5]

At the Rule 12(b)(6) stage, this accumulation of direct remarks and systemic removals satisfies the threshold required to withstand dismissal.[6] The active suppression of evidence provides independent corroboration. Defendants' cited authorities regarding stray remarks and demographic matching are inapplicable to a deliberate departmental purge driven by a dean's articulated demographic preferences.

### III.    The "Declining Enrollment" Pretext is Defeated by Concurrent Hiring and Discriminatory Application

Defendants contend that the failure to renew Plaintiffs' contracts was made without regard to discriminatory animus and was instead made based on legitimate business considerations of declining enrollment and programmatic necessity. This post-hoc business justification is directly contradicted by the University's simultaneous conduct and is specifically pled in the Complaint as a false pretext to cover-up for the demographic purge (*see* Compl. ¶ 42).

First, the University's reliance on enrollment metrics was selectively applied to create a justification for termination. Dean Petenkemani had previously and explicitly told faculty members that they were not responsible for enrollment figures (*id*. ¶ 43). However, despite being pro-active in addressing enrollment concerns by developing new programs and innovative pedagogical approaches, Plaintiffs were still undermined by Dean Petenkemani's office in intentionally delaying or disrupting them for over one year (*id*. ¶¶ 44, 67, 86). In contrast, younger and non-white faculty members were not subjected to the same scrutiny regarding enrollment figures in their respective courses (*id*. ¶ 45), and Petenkemani admitted to Dr. Power that a faculty member outside his demographic who was retained in his staid was "not competent" to perform the same work as Dr. Power (*id*. ¶ 70).

---

[5]    Defendants' reliance on *Cooper v. Templeton*, 629 F. Supp. 3d 223 (S.D.N.Y. 2022), and *Jones v. Gen. Bd. of Glob. Ministries of United Methodist Church*, 1997 U.S. Dist. LEXIS 11921 (S.D.N.Y. Aug. 11, 1997) (internal quotation omitted), is misplaced. *Cooper* involved an employer who conducted an "internal review" before terminating the plaintiff who merely argued that the review was insufficient. Similarly, *Jones* involved a plaintiff complaining that the employer's internal review was not thorough enough. Neither case involves the affirmative removal of an independent investigator to install an insider who deliberately steers the outcome to protect a biased supervisor who executed an expressly identified discriminatory agenda, as is explicitly alleged here (Compl. ¶¶ 50-51, 178, 183).

[6]    Defendants cite *Lively v. WAFRA Inv. Advisory Grp., Inc.*, to dismiss Plaintiffs' claims as naked assertions. The *Lively* plaintiff merely pled conclusory allegations of a campaign to purge older workers while "offer[ing] no details that would support any inference of age discrimination". The Complaint here isolates seven white professionals over age fifty systematically eliminated between July 2024 and May 2025 pursuant to a decision-maker's stated demographic preference. Defendants also rely on *White v. Roosevelt Union Free Sch. Dist. Bd. of Educ.* and *Bazile v. N.Y. City Hous. Auth.* to attack the factual pleadings. But the *White* court sustained a plaintiff's racial discrimination claim based upon hostile statements and disparate treatment. The *Bazile* court also denied summary judgment because the record contained circumstantial evidence of racial bias. Finally, Defendants cite *Relevent Sports, LLC v. Fédération Internationale De Football Ass'n.*, which involved horizontal market agreements under the Sherman Antitrust Act and bears zero relevance to employment discrimination.

Second, the University's claim that low enrollment necessitated a reduction in personnel levels is defeated by its concurrent hiring practices (*id*. ¶ 46). After initiating the termination of Plaintiffs' contracts, the University hired a new Associate Dean and additional professors in the School of Business who were outside of Plaintiffs' protected demographics (*id*.). The University also began advertising for new positions in the School of Business through public postings on sites such as LinkedIn (*id*. ¶ 47).

Terminating highly qualified core faculty members under the pretense of a decline in enrollment—while simultaneously recruiting and hiring non-white and younger replacements in the School of Business—easily satisfies Plaintiffs' burden under Rule 12(b)(6) to allege sufficient allegations to establish that the University's "declining enrollment" justifications were pretextual.[7]

**IV.    Dr. Power Properly Pleads an Independent Retaliation Claim and an Actionable Constructive Discharge**

Defendants argue that Dr. Power cannot state a retaliation claim because the initial recommendation for his non-renewal occurred in February 2025, prior to his internal Title IX complaints. This ignores the severe escalation of retaliatory adverse actions against Dr. Power *after* he engaged in protected opposition (*id*. ¶ 72).

In response to Dr. Power's protected opposition activities, Dean Petenkemani engaged in systematic retaliatory adverse actions, including stripping Dr. Power of his leadership roles, removing him as Chair of Graduate Business as of July 1, 2025, and removing him as MBA Program Director as of August 30, 2025 (*id*. ¶ 73). These actions reduced Dr. Power to the rank of Assistant Professor (*id*.). Additionally, Dean Petenkemani escalated his retaliatory campaign by requiring Dr. Power to spend eleven hours per day physically located in the Manhattan office for work purposes, even though Dr. Power had evening classes until 10:00 p.m. (*id*. ¶ 74).[8]

---

[7]    Defendants rely on cases where employers presented neutral, non-discriminatory reasons for adverse actions that the plaintiffs could not rebut. Those authorities are entirely inapposite to the deliberate sabotage and replacement hiring alleged here. For example, in *Ortiz v. Hempstead Union Free Sch. Dist.*, the plaintiff was terminated because he completely lacked the mandatory state certification required to hold his position. In *Williams v. Brooklyn Union Gas Co.*, decided at the summary judgment stage, a mailroom supervisor falsified his overtime records and was fired for continuous insubordination. In *Cuellar v. Christie's Inc.*, the plaintiff did not allege discriminatory comments related to his protected characteristics. In *Drummond v. IPC Int'l, Inc.*, decided at summary judgment, a security director admitted to pulling a female employee onto his lap in a private office and was fired at the explicit request of the property owner.

[8]    The NYCHRL "does not require either materially adverse employment actions or severe and pervasive conduct." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). It requires an independent analysis from federal and state law claims and must be construed broadly in favor of discrimination plaintiffs, who need only plead that they were treated "less well" due to a discriminatory intent. *Id.* at 114. The further imposes liability for any retaliatory conduct that is "reasonably likely to deter a person from engaging in such action." *Id.* at 112. Stripping a department chair of his leadership titles undeniably meets this standard. *See Panagopoulos v. N.Y. State DOT*, 172 F. Supp. 3d 597, 619 (N.D.N.Y. 2016) (An adverse employment action occurs when an employee is *de facto* "stripped of [his job] responsibilities and not allowed to perform those functions."). Forcing a resignation under explicit threats of career destruction constitutes constructive discharge. *See Green,* 952 F.3d at 404 (2d Cir. 2020).

This retaliatory campaign culminated in an actionable constructive discharge. Dr. Power, knowing he had a terminal contract, took actions to mitigate his damages through obtaining additional part-time teaching jobs at Queensborough Community College and Mount St. Vincent (*id*. ¶ 75). When Mercy University discovered Dr. Power's mitigation employment, Defendants weaponized the Faculty Handbook to further retaliate against him (*id*. ¶ 76). On September 30th, 2025, Mercy University's Vice President of Human Resource Services sent a threat of immediate termination "with cause" if Dr. Power did not tender his resignation from Mercy by the end of the next working day, October 1, 2025 (*id*.). Additionally, the University specifically stated that Mercy would contact Dr. Power's newly secured employer to potentially prevent future job opportunities (*id*. ¶ 77).

Dr. Power was forced to resign under extreme duress on October 1, 2025, and documented the reasons why in detail in his resignation letter (*id*. ¶ 78). A choice between resigning or being imminently fired under explicit threats of career destruction constitutes constructive discharge as a matter of law. *See Green v. Town of East Haven*, 952 F.3d 394, 404 (2d Cir. 2020). Defendants' cited authorities regarding retaliation are wholly distinct from the institutional duress documented here.[9]

## V.    The Wage Claim Defense Relies on Disputed Facts, and Individual Liability Correctly Attaches to the Corporate Officers

Defendants seek to dismiss Dr. Power's New York Labor Law wage claim by claiming that his paystubs demonstrate that he was paid through November 30, 2025. To support this claim, Defendants state as a matter of fact that Power's last day of work was November 15, 2025. Both defenses are based upon unproven and challenged misrepresentations of the nature of Dr. Power's claims in the Complaint.

---

[9]    Defendants' retaliation and causation authorities are completely inapposite. In *Conway v. Healthfirst Inc.*, the court explicitly denied the employer's motion to dismiss the retaliation claims. The court held that by providing specific dates of protected activity and subsequent adverse actions, the plaintiff successfully established temporal proximity. Defendants cite *Chamberlain v. Splashlight, LLC* to dispute the causal nexus between Dr. Power's protected complaints and his forced resignation. But the *Chamberlain* plaintiff failed to respond to defendant's motion to dismiss and his "Complaint contain[ed] no allegations tying Chamberlain's sex or sexual orientation to his employment termination, as opposed to some other reason." In *Shixuan Luo v. AIK Renovation Inc.*, the court dismissed a retaliation claim where a project manager's internal complaints were restricted to general grievances about safety equipment and disorganized deliveries. In *Ojinika v. Montefiore Med. Ctr.*, the plaintiff failed to allege any harm resulting from the defendant's "retaliatory" conduct. In *Bonilla v. City of New York*, the court denied dismissal of the plaintiff's retaliation claims. In *Thomas v. Amazon.Com Servs. LLC*, the plaintiff's retaliation claims variously failed where plaintiff: failed to allege protected conduct; alleged mere "petty slights or trivial inconveniences;" and failed to establish temporal proximity. In *Ochoa v. N.Y. City Dep't of Educ.*, the plaintiff likewise failed to establish temporal proximity. In *Fields v. New York City Health & Hosp. Corp.*, the alleged "retaliation" would not have "dissuade[d] a reasonable employee" from bringing charges of discrimination and the plaintiff also failed to establish temporal proximity. In *Seale v. Madison Cnty*, the court refused to dismiss plaintiff's claims that scheduling changes were materially adverse and retaliatory. In *Reichman v. City of New York*, decided at the summary judgment stage, the plaintiff neither suffered an adverse employment action, experienced conduct that would dissuade a reasonable employee from bringing charges of discrimination, nor established causation. In *Brooks v. DOE Fund, Inc.*, summary judgment was granted where the plaintiff did not suffer an adverse employment action or materially retaliatory conduct.

The Complaint explicitly locks Dr. Power's final day of employment as October 1, 2025 (Compl. ¶ 78). Prior to his constructive discharge, Plaintiff Power performed compensable work for Defendant Mercy University, specifically completing tutorials and course overloads during the beginning of the Fall 2025 quarter (*id*. ¶ 187). Despite Plaintiff Power having completed this work and having the work certified, the University has willfully withheld approximately $12,000 to $14,000 in earned wages (*id*. ¶ 188). Defendants are referencing an unpled timeline and mischaracterization of payroll records to dismiss a statutory claim for unpaid wages and liquidated damages under NYLL Article 6 (*id*. ¶ 189).

Finally, individual liability under the NYSHRL and NYCHRL correctly attaches to the Individual Defendants. Aiding and abetting liability applies to those who participate in the conduct giving rise to the discrimination and retaliation claims (*id*. ¶¶ 136, 177).

- Defendant Petenkemani instigated the discriminatory purge of older white faculty members, made explicitly discriminatory statements regarding his demographic preferences, and orchestrated the retaliatory harassment and stripping of Plaintiff Power's leadership titles (*id*. ¶ 137).

- Defendant Greenwood aided and abetted the discriminatory scheme by willfully adopting and implementing Defendant Petenkemani's fraudulent non-reappointment recommendations without conducting a requisite independent review (*id*. ¶¶ 142, 173).

- Defendant Catros actively suppressed evidence of Defendant Petenkemani's unlawful conduct by abruptly removing the independent external investigator, assuming control of the inquiry, and deliberately steering the investigation to reach a pre-ordained finding of "no violation," effectively orchestrating a sham internal investigation to protect Defendant Petenkemani (*id*. ¶¶ 178, 183).

Individual liability is clearly applicable to corporate officers who have actual authority and control over employee management and actively participate in the conduct giving rise to the claim.[10]

In sum, Plaintiffs' allegations in the Complaint defeat Defendants' pre-motion arguments completely. Plaintiffs therefore respectfully request that the Court deny Defendants' anticipated motion to dismiss and direct Defendants to file an Answer to the Complaint.

Respectfully submitted,

*Ariel Graff*

Ariel Y. Graff

The Court will hold a pre-motion conference on 7/7/26, at 3:30.

So Ordered.

6/12/26

---

[10]    In *Bueno v. Eurostars Hotel Co.*, the court explicitly denied the corporate CEO's motion to dismiss because the individual defendant "actually participated in the plaintiff's termination."